# In re J-F-F-, Respondent

*Decided by Attorney General May 1, 2006*

U.S. Department of Justice
Office of the Attorney General

An alien's eligibility for deferral of removal under the Convention Against Torture cannot be established by stringing together a series of suppositions to show that it is more likely than not that torture will result where the evidence does not establish that each step in the hypothetical chain of events is more likely than not to happen.

FOR RESPONDENT: Pro se

FOR THE DEPARTMENT OF HOMELAND SECURITY: Tara Naselow-Nahas, Deputy Chief Counsel

## BEFORE THE ATTORNEY GENERAL
(May 1, 2006)

Respondent, a native and a citizen of the Dominican Republic and a permanent resident of the United States, was convicted of rape by force and found removable because his rape conviction qualifies as an aggravated felony under section 101(a)(43)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(43)(A) (2000). The Immigration Judge concluded, however, that it was more likely than not that respondent would be tortured if returned to the Dominican Republic and therefore granted a deferral of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture" or "CAT").

In a brief order, the Board of Immigration Appeals affirmed.[1] On February 10, 2006, pursuant to my authority under 8 C.F.R. § 1003.1(h), I directed the Board to refer to me for review its decision in this matter and

---

[1] The Board found "no clear error in the factual findings of the Immigration Judge" and "insufficient reasons to reverse the Immigration Judge's determination that [respondent] should be granted protection under the Convention Against Torture." On December 21, 2005, the Board denied the Department of Homeland Security's ("DHS") motion for reconsideration of its July 7, 2005, order.

stayed the decision pending my review. Respondent has failed to present and support a valid Convention Against Torture claim. For the reasons set forth below, I disapprove the Board's decision and deny respondent's application for deferral of removal.

## I.

I review de novo all aspects of the Board's and Immigration Judge's decisions in this case. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (A.G. 1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations."). The law vests in the Attorney General much of the authority to make individual immigration determinations.[2] *See generally* section 103(g) of the Act, 8 U.S.C. § 1103(g) (Supp. II 2002); *Matter of D-J-,* 23 I&N Dec. 572, 573-74 & n.2 (A.G. 2003). The Executive Office for Immigration Review, which includes the Board and Immigration Judges, is subject to the direction and regulation of the Attorney General.[3] While Attorneys General have delegated their authority to the Board and Immigration Judges in the first instance, I retain the power to exercise full decisionmaking upon review. *See Matter of D-J-*, *supra*, at 575 (noting that, unlike the Immigration Judge and the Board, who exercise limited authority dependent upon delegation from the Attorney General, the Attorney General is "authorized to make the determination based on [his] own conclusions on the facts and the law").

---

[2] The Secretary of the DHS has certain authority to enforce and administer the Act and related laws, while the Attorney General retains others, including the decisionmaking authority exercised here. Section 103(a)(1) of the Act, 8 U.S.C. § 1103(a)(1) (Supp. II 2002), charges the Secretary with administration and enforcement "except insofar as this chapter or [relevant] laws relate to the powers, functions, and duties conferred upon the President [and] Attorney General," among others. The "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." *Id.*

[3] Homeland Security Act of 2002, Pub. L No. 107-296, § 1101, 116 Stat. 2135, 2273 (codified at 6 U.S.C. § 521 (Supp. II 2002)) (providing for direction and regulation by the Attorney General under section 103(g) of the Act, 8 U.S.C. § 1103(g)).

II.

A.

Respondent was born in the Dominican Republic in 1961, and he was admitted to the United States as a lawful permanent resident in 1970. Although his parents and siblings became naturalized United States citizens, respondent never completed the naturalization process he initiated around 1980.

On January 9, 1986, while living at his parents' home in Los Angeles, respondent raped his 55-year-old neighbor. Having learned that his neighbor was home alone because her husband was in the hospital, respondent tied her up, threatened her at knifepoint, and repeatedly raped and sexually assaulted her over the course of 4 hours. When he was later interviewed about the incident, he explained that he committed the crime because he "was drunk on beer and wine." After serving a 15-year sentence for the rape, respondent was released in November of 2001. While incarcerated, he attacked a fellow inmate on one occasion and threatened to kill a female corrections officer on another.

On December 11, 2003, respondent was issued a notice to appear for removal proceedings charging him with being removable from the United States under section 101(a)(43)(A) of the Act, 8 U.S.C. § 1101(a)(43)(A) (defining aggravated felony). *See also* section 237(a)(2)(A)(iii) of the Act, 8 U.S.C. § 1227(a)(2)(A)(iii) (2000). Respondent admitted at his hearing before the Immigration Judge that he had committed an aggravated felony in the United States and that he was removable. Upon finding that respondent was removable under this provision, the Immigration Judge "[o]rdered that the respondent be removed and deported to the Dominican Republic" and subsequently granted him deferral of removal under the law and regulations implementing the CAT. *See* 8 C.F.R. § 1208.17(a) (2006).

Between March 23 and June 3, 2004, respondent appeared before the Immigration Judge for five hearings in his removal proceedings. In these proceedings, respondent admitted the allegations and the charge of removability; he confirmed that he was a native and citizen of the Dominican Republic and admitted that he had been convicted of rape by force. The Immigration Judge suggested on April 14 that respondent might be eligible for a waiver under former section 212(c) of the Act, 8 U.S.C. § 1182(c) (1994) (repealed and replaced in 1996 by a new section, section 240A(a), 8 U.S.C. § 1229b(a) (2000)), which permits certain categories of permanent residents to be admitted "in the discretion of the Attorney General." Respondent

refused to allow his mother to testify in support of the waiver, against the Immigration Judge's urging. Acting sua sponte, the Immigration Judge then dismissed the case without prejudice on the ground that this and other behavior showed that respondent was incompetent.

The Board reversed the Immigration Judge's termination of proceedings. It first noted that the psychiatric evaluation of respondent in the record and respondent's testimony before the Immigration Judge suggested that respondent was fit for trial. It pointed out that at the Immigration Judge's request, the Government had introduced a psychiatric evaluation, dated February 19, 2004, in which the psychiatrist "cleared [respondent] to stand trial," although this report stated that respondent had schizoaffective and bipolar disorders and observed that respondent had been admitted to various hospitals as a result of his mental illness. It also noted respondent's hearing testimony confirming the psychiatrist's assessment that he fully understood the proceedings and wanted to proceed. The Board then went on to note that the Immigration Judge's principal concern with respect to respondent's competence appeared to be that the alien would be unable effectively to present his claim for section 212(c) relief, but that because respondent's felony forcible rape conviction made him ineligible, this concern was unfounded and the Immigration Judge should not pursue consideration of this claim further. *See* 8 C.F.R. § 1212.3(f)(5) (2006). Finally, the Board reminded the Immigration Judge that regulations provide for removal proceedings against incompetent aliens, with others being allowed to appear on the alien's behalf, *see* section 240(b)(3) of the Act, 8 U.S.C. § 1229a(b)(3) (2000); 8 C.F.R. § 1240.4 (2006), and remanded to the Immigration Judge for further proceedings consistent with its opinion.

On remand, the Immigration Judge introduced the prospect of CAT relief, questioned respondent on the subject until he decided to make the claim, and ultimately granted CAT relief on grounds respondent had not mentioned in his application. When the Immigration Judge first asked respondent whether he was "afraid of being persecuted or tortured in the Dominican Republic," he responded, "Uh, no, ma'am." Respondent said he was aware that his admission required that the Immigration Judge order him removed and deported to the Dominican Republic. After asking a series of questions to which respondent gave answers that did not support deferral of removal under the CAT, the Immigration Judge asked, "So, what do you wish to do?" He replied, "The reason that I don't wanna get deported [is] because I have nobody in [the] Dominican Republic. All my family's in the United States." The Immigration Judge then presented respondent with his choices: "[T]he Board of Immigration Appeals has determined that you do not qualify for the

[212(c)] waiver, sir.  So, the only option I have left is whether or not you can prove that you would be tortured in the Dominican Republic."  Respondent replied, "There's no civil war going on in [the] Dominican Republic.  There's a slight disturbance." Trying again, the Immigration Judge asked, "Sir, do you fear returning to the Dominican Republic?"  When respondent answered, "Yes, ma'am," she asked, "Do you wish to apply for protection under the Torture Convention?"  Respondent said, "Yes."

Respondent then submitted the Form I-589 (Application for Asylum and Withholding of Removal) necessary to apply for deferral of removal under the Convention Against Torture.  Respondent's application for CAT relief did not mention fear of police brutality, nor did his initial testimony at the 1-day hearing.  In answer to the Form I-589 question, "Why [do] you believe you would or could be harmed or mistreated," respondent wrote, "They might try to kill me.  Communists might try to kill me.  They might know me."  In answer to the form question, "Why [are] you  . . . afraid and describe the nature of the torture you fear, by whom, and why it would be inflicted," he wrote, "They was after the family who work for the government to kill us." At the hearing, respondent maintained that he feared harm or mistreatment on return to the Dominican Republic at the hands of "[f]ormer people that used to be under the Communists" or "criminals" who "would use a machete to kill people to rob them."  The Immigration Judge asked whether he thought the police would "bother" him in the Dominican Republic.  Without specifying whether he feared Communists, criminals, the police, or other actors, he agreed that there is "torture in [the] Dominican Republic, they mistreat people over there very bad, especially if you [are] a stranger."

In response to questioning by the Immigration Judge about his mental condition, respondent testified that he takes the medication Xyprexa once a day, which he buys with the aid of state benefits.  He admitted that there have been a few times when he has stopped taking his medication—on occasion simply "[t]o see what would happen"—and that when he did stop "[n]othing happened."  He said that he had been "perfectly fine" without his medication when he spent 8 months in a county jail.  When asked whether "anything happen[s]" when "you're not in jail, and you don't take your medication," he responded, "No."  Specifically, the Immigration Judge asked whether respondent was "not taking medication," when he committed the rape.  He responded that he was "[t]aking medication" at the time.

The Immigration Judge then asked respondent whether he thought he needed his medication.  After stating that "nothing happened" when he was not medicated and agreeing that he was "perfectly fine" without it, respondent finally agreed that he needed his medication to "keep [him] in balance"

because without medication he got "a little rowdy." The Immigration Judge asked him whether it was under these circumstances that "the police arrest you," to which he responded, "Yeah." According to respondent, the medication that he took is "unavailable in the Dominican Republic" because "they don't have no hospital like they have in United States." He conceded, though, that his basis for this supposition was weak because he did not "know much about [the] Dominican Republic, how they run the government, how they run the social department."

On the basis of this testimony, and the State Department's Country Report on the Dominican Republic, discussed below, the Immigration Judge granted respondent's application for deferral of removal.

## B.

"In considering an application for [deferral] of removal under the Convention Against Torture, the Immigration Judge shall first determine whether the alien is more likely than not to be tortured in the country of removal." 8 C.F.R. § 1208.16(c)(4) (2006). In making this determination, "all evidence relevant to the possibility of future torture shall be considered." 8 C.F.R. § 1208.16(c)(3). To prevail, the respondent must show that "he is more likely than not to suffer intentionally-inflicted cruel and inhuman treatment that either (1) is not lawfully sanctioned by that country or (2) is lawfully sanctioned by that country, but defeats the object and purpose of CAT." *Nuru v. Gonzales*, 404 F.3d 1207, 1221 (9th Cir. 2005) (emphasis removed). The Government need not prove the opposite: "The burden of proof is on the applicant." 8 C.F.R. § 1208.16(c)(2); *see also, e.g.*, *Kamalthas v. INS*, 251 F.3d 1279 (9th Cir. 2001). If the evidence is inconclusive, the applicant has failed to carry his burden.

In granting respondent deferral of removal under the Convention Against Torture, the Immigration Judge strung together a series of suppositions: that respondent needs medication in order to behave within the bounds of the law; that such medication is not available in the Dominican Republic; that as a result respondent would fail to control himself and become "rowdy"; that this behavior would lead the police to incarcerate him; and that the police would torture him while he was incarcerated. The evidence does not establish that any step in this hypothetical chain of events is more likely than not to happen,

let alone that the entire chain will come together to result in the probability of torture of respondent.[4]

First, respondent gave contradictory testimony about his behavior when unmedicated. Respondent originally insisted that his behavior does not change when he fails to take his medication, claimed that he had been "perfectly fine" when he had not taken his medication in the past, and confirmed that he had been taking his medication when he committed the violent rape that rendered him removable (suggesting that his "rowdiness" does not depend on lack of medication). Moreover, respondent's testimony reveals that he chooses on occasion to forego medication even when it is available. Only after persistent questioning by the Immigration Judge did respondent indicate that he got "a little rowdy" without his medication. It may be that respondent's behavior worsens when he is unmedicated, but the evidence presented indicates that, if anything, lack of medication is not a good predictor of respondent's violent actions.[5]

Second, based on respondent's admittedly uninformed guess that he could not procure his medication in the Dominican Republic, and a single sentence about the general shortage there of mental health resources from the State Department's Country Report, the Immigration Judge presumed that respondent would not receive medication while in the Dominican Republic.[6] This is a far cry from proving the point. It may be that state-supplied drug

---

[4] *See Matter of Y-L-*, 23 I&N Dec. 270, 282 & n.16 (A.G. 2002) (string of speculative events in a country with violent incidents but a non-complacent government insufficient for CAT showing). An alien will never be able to show that he faces a more likely than not chance of torture if one link in the chain cannot be shown to be more likely than not to occur. It is the likelihood of all necessary events coming together that must more likely than not lead to torture, and a chain of events cannot be more likely than its least likely link.

[5] The psychiatrist's report submitted by the Government, prior to this testimony, did not seek to answer the question whether or under what circumstances respondent behaves badly. While that report described respondent as "carr[ying] the diagnosis of Schizoaffective Disorder versus Bipolar Disorder," the psychiatrist concluded that respondent was fit to participate in the adjudication because "he fully understand[s] what type of court Your Honor presides over, the possible outcomes of the proceedings, and he feels comfortable answering Your Honor's questions and defending himself at trial."

[6] When asked how he knew he would not be able to obtain medication in the Dominican Republic, he replied: "Because they don't have that kind of program over there, not that I know. I don't know much about the Dominican Republic, how they run the government, how they run the social department."

care is less extensive in the Dominican Republic than in California, but respondent is not a credible source for this fact. The particular drug he takes may be unavailable there, or it may be available for half the cost. The evidence does not say. After stating that it was "unknown" whether respondent's medication would be available and "unknown" whether his family could pay for the medication, the Immigration Judge concluded that in the absence of evidence that he *could* get his medication, she would presume otherwise. This conclusion flips the burden on its head, inappropriately relieving respondent of his responsibility to prove his case. *See* 8 C.F.R. § 1208.16(c)(2). If one cannot know from the evidence whether he will have access to medication, then respondent has by definition failed to show he is more likely than not to be denied access. Both respondent's uninformed speculation and the Immigration Judge's reference to a vague statement in the Country Report fall far short of proving that he is more likely than not to go without medication.

Third, in concluding that these first two points would lead to respondent's arrest in the Dominican Republic, the Immigration Judge relied on her belief—contrary to respondent's testimony—that respondent "without his medication, has found himself in the hands of the police in this country." In fact, the crime for which the Government seeks to remove him was committed while he was "taking medications." The Immigration Judge speculated that "rowdy" behavior would lead to arrest, but when the Immigration Judge asked respondent "what happens if somebody gets rowdy?", respondent did not reply that rowdy behavior attracted the attention of the authorities. To the contrary, he responded that "they leave them on the streets," and "don't bother them. They let them be in the streets." Again, the evidence presented by respondent is contradictory; he does not show that it is likely—with or without medication—that he would attract the attention of the Dominican police, and therefore cannot show that torture by the police is more likely than not.

Next, there is the central question how police in the Dominican Republic would treat respondent if they had cause to interact with him. Respondent has admitted that the Dominican Government has never tortured either him or, to his knowledge, anyone in his family.[7] Putting aside whether he is more likely than not to find himself in police custody, respondent did not present any direct evidence that the police would more likely than not torture someone in

_____

[7] Respondent answered "no" to three questions posed by the Immigration Judge: "Did the Communists ever harm any of your family? Were you ever harmed by the Communists? Have you ever been harmed by the government of Dominican Republic?"

his position.  When prompted, he was merely able to state the required claim: that there is "torture in [the] Dominican Republic, they mistreat people over there very bad, especially if you [are] a stranger."  Only after his primary testimony had ended, and after hearing the Immigration Judge's explanation of her tentative decision to the Government's lawyer, did respondent point to evidence to support the Immigration Judge's theory.  He did so solely by reading a few passages from the Department of State Country Report on the Dominican Republic, and not from personal knowledge.

The only evidence presented therefore came from respondent's brief reading and the Immigration Judge's more complete reading of the Country Report.[8]  Based on the Country Report, the Immigration Judge found that "some security forces, primarily mid-level and lower ranking police officers continued to torture, beat, and otherwise physically abuse detainees and prisoners."  The report indicates that police and military mistreatment of prisoners has been an ongoing problem in the Dominican Republic, but it also stresses that the Dominican Government takes prohibitions against torture seriously and refers such cases to civilian courts.  The Immigration Judge acknowledged that the State Department report established that the Dominican Republic's constitution and laws prohibit torture and other forms of physical abuse, that senior police officials take these requirements seriously by regularly investigating torture and abuse allegations, and that prosecutors had filed charges alleging torture against military and police officials in the past.  Both the Immigration Judge and respondent critically failed to address the ultimate question whether this mistreatment is common enough to make it more likely than not that respondent would be so treated.[9]

The United States has embraced important treaty obligations under the CAT that are consistent with our values as a democratic society.  The possibility of

---

[8]  A review of the 2004 and 2005 Country Reports on the Dominican Republic indicates that conditions have not relevantly changed from the 2003 report upon which the Immigration Judge relied.

[9]  The Immigration Judge also noted that "discrimination against persons with mental illness was common," but whether the discrimination takes the active form of beatings or inactive form of government neglect, and again, how likely respondent would be to experience it, the record cannot answer.  It was likewise inappropriate for the Immigration Judge to rely upon her conclusion that there are insufficient resources devoted to mental health in the Dominican Republic.  A lack of resources is regrettable, but it does not constitute torture under the regulations.  *See* 8 C.F.R. § 1208.18(a) (2006).

torture is a serious charge that calls for serious consideration. It is "the policy of the United States," within the meaning of United States obligations under the CAT, "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Foreign Affairs Reform and Restructuring Act of 1998, Div. G of Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681, 2681-761, 2681-822; *see also* note 2 to section 241 of the Act, 8 U.S.C. § 1231 (2000). But in this case, the Immigration Judge relied upon several irrelevant factors in deciding to grant respondent deferral of removal under the CAT. In her discussion of the likelihood of torture, the Immigration Judge prominently concluded that removing respondent from the United States after so many years would be "cruel." The Immigration Judge also focused on multiple other hardship factors, such as respondent's living arrangements in the Dominican Republic and whether he would be able to hold a job, that would have been relevant in the section 212(c) context, had the Board not already properly concluded that respondent was ineligible for 212(c) relief. But these kinds of hardship considerations are not independently relevant to determining whether he is more likely than not to be tortured upon return. The Immigration Judge in this case may have been moved by these factors and respondent's strong desire to remain in the United States. As officers of the Executive Branch, however, we are bound by law and duty to apply impartially the statutory scheme Congress has established to govern the lawful deportation of permanent residents convicted of an aggravated felony.

### III.

At the Immigration Judge's urging, respondent has speculated that he may lack access to appropriate psychiatric medication in the Dominican Republic, that the lack of medication may affect his behavior, that his behavior may cause him to be arrested, and that once arrested he may face mistreatment at the hands of criminals or lower-level police officers. Taken together these speculations do not amount to a likelihood of torture. Because respondent has failed to carry his burden, I disapprove the Board's decision, deny the respondent's application for deferral of removal, and affirm the Immigration Judge's February 3, 2005, order of removal and deportation to the Dominican Republic.

An alien may file a motion seeking to reopen a final order of removal within 90 days pursuant to section 240(c)(7) of the Act, 8 U.S.C. § 1229a(c)(7) (2000), and 8 C.F.R. § 1003.2 (2006). The motion must be

accompanied by affidavits or other evidentiary material that support new facts. The motion shall not be granted unless it appears that the evidence sought to be offered was not available and could not have been discovered or presented at the former hearing.[10]  This case is unusual because both respondent and the Department of Homeland Security were unaware at the final hearing that they would be called upon to present evidence on the Immigration Judge's theory that respondent would be incarcerated and tortured by police.  While respondent did not request additional time to present evidence and did not attempt to supplement the record, the Immigration Judge's active role in the management of respondent's presentation of his own case and her immediate ruling in his favor could have led respondent to believe that no additional evidence was necessary.

It is appropriate for Immigration Judges to aid in the development of the record, and directly question witnesses, particularly where an alien appears pro se and may be unschooled in the deportation process, but the Immigration Judge must not take on the role of advocate. *See* section 240(b)(1) of the Act, 8 U.S.C. § 1229a(b)(1) (2000) (providing that Immigration Judges shall "interrogate, examine, and cross-examine the alien and any witnesses"); 8 C.F.R. § 1240.11(a)(2) (2006) ("The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing."); *see also Agyeman v. INS*, 296 F.3d 871, 884 (9th Cir. 2002) (stating that "the IJ has a duty to fully develop the record when an alien proceeds pro se").  I do not decide whether the Immigration Judge's actions here are sufficient to satisfy the requirement that rehearing be denied if the evidence could have been presented at the prior hearing. *See* 8 C.F.R. § 1003.2(c)(1).  A decision on this point will require review of the Immigration Judge's conduct at the original hearing, which went well beyond her obligations, even bearing in mind that respondent was proceeding pro se. Therefore if respondent does move to reopen and the Board grants the motion, I am directing that the case be assigned to another randomly selected Immigration Judge for decision.  In light of respondent's continued detention,

---

[10]  8 C.F.R. § 1003.2(c)(1); *INS v. Doherty*, 502 U.S. 314, 323 (1992) (noting there are "'at least' three independent grounds on which the Board might deny a motion to reopen—failure to establish a prima facie case for the relief sought, failure to introduce previously unavailable, material evidence, and a determination that even if these requirements were satisfied, the movant would not be entitled to the discretionary grant of relief which he sought") (citation omitted).

I direct the Board and Immigration Judge to conduct any further proceedings as promptly as possible consistent with a full and fair consideration of the issues.