**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| Maria Elena Luna,<br><br>        Petitioner,<br><br>   v.<br><br>Merrick B. Garland, U.S. Attorney General,<br><br>        Respondent. | No. 21-182<br><br>Agency No.<br>A036-838-820<br><br>MEMORANDUM[*] |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 16, 2023
Pasadena, California

Before: PAEZ, CHRISTEN, and MILLER, Circuit Judges.
Dissent by Judge MILLER.

Maria Elena Luna, a native and citizen of the Philippines, petitions for

review of the Board of Immigration Appeals' (BIA) decision denying her

application for protection under the Convention Against Torture (CAT).  We

have jurisdiction pursuant to 8 U.S.C. § 1252(a).  We review de novo questions

of law and review the agency's factual findings for substantial evidence.

*Ahmed v. Holder*, 569 F.3d 1009, 1012 (9th Cir. 2009).  "Where the BIA does

---

[*]     This disposition is not appropriate for publication and is not
precedent except as provided by Ninth Circuit Rule 36-3.

not independently review the record, or where the BIA relies upon the Immigration Judge's (IJ) opinion as a statement of reasons, we look to the IJ's oral decision as a guide to what lay behind the BIA's conclusion." *Kozulin v. I.N.S.*, 218 F.3d 1112, 1115 (9th Cir. 2000). Because the parties are familiar with the facts, we recite only those necessary to decide the petition.

Luna was admitted to the United States as a lawful permanent resident in 1979 at the age of three. After a tumultuous childhood, Luna became addicted to methamphetamine at the age of eighteen. At age nineteen, Luna committed a serious crime for which she served more than twenty years in prison. Until 2009, Luna continued to use drugs, and she also sold drugs inside of prison. Luna has been sober since 2009 and has been in recovery since 2012. In 2018, Luna was granted parole and transferred to immigration detention.

Luna seeks CAT relief based on the risk that she would be tortured or killed in the Philippines as part of the government's drug war. She cites several reports documenting the government's abuse of those associated with drug use in the Philippines, as well as her expert witness's declaration and testimony before the IJ. The expert testified that the government of the Philippines maintains a list of "known drug users," who are targeted for killing. He further testified that the list is not vetted and that, as a former drug user, Luna would be at risk of being added to the list whether she relapses or not.

Luna has been in recovery while incarcerated with services available, but she testified that in immigration detention (where she lacked access to services

2

and faced the stress of potential deportation), she would have relapsed had drugs been available. Luna's expert testified that there are very few rehabilitation services available in the Philippines, and those that do exist are ineffective, cost prohibitive, or both. Luna does not speak Tagalog but did receive some vocational training while incarcerated, including as a mechanic, landscaper, and drug counselor.

Regarding the CAT claim, the Philippines' state-sponsored killing of drug users, particularly methamphetamine users, is undisputed, and the government did not dispute that Luna would face a substantial likelihood of being killed should she be placed on a government watch list of "known drug users." But the IJ found no "clear probability" that Luna would relapse if deported to the Philippines, and no "clear probability that the government of the Philippines or anybody else in the Philippines will learn of her criminal past or even her drug use." The BIA affirmed, finding no clear error.

In our court, Luna argues that the IJ and BIA erred by misstating her expert witness's testimony, making and relying on factual findings contrary to the record, and failing to consider the aggregate risk that she will be placed on the government's "known drug user" list for any of several reasons including her history of drug use and the risk that she will relapse. We agree that the agency erred.

**1. Consideration of the Evidence.** "In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of

removal, all evidence relevant to the possibility of future torture shall be considered . . . ." 8 C.F.R. § 208.16(c)(3). "[W]here there is any indication that the BIA did not consider all of the evidence before it, a catchall phrase does not suffice, and the decision cannot stand. Such indications include misstating the record and failing to mention highly probative or potentially dispositive evidence." *Cole v. Holder*, 659 F.3d 762, 771–72 (9th Cir. 2011).

The BIA discerned no clear error in the IJ's finding that Luna would not be targeted for torture if she did not relapse. But in reaching this conclusion, the BIA specifically observed that the record supports the IJ's finding that "according to the respondent's expert witness[,] the respondent is unlikely to be in any danger if she does not reoffend and she does not use drugs again." This statement misstates the record of the expert's opinion. In his declaration, the expert actually stated that, "[m]arked as a *former or current drug user*, the deportee could very well face the fate of those who have been summarily executed in the last year." At the hearing, the expert testified that Luna would be at risk if she relapsed, but also that "if her record of drug use and arrest becomes common knowledge, then . . . there is a good likelihood she'll end up on a list." The BIA justified its characterization of the record by stating: "The expert . . . testified that a past drug user must usually first become a known drug user in order to be placed on the watch-list." But this only further demonstrates the BIA's failure to consider the record evidence. In response to a question about the danger for past drug users in the Philippines, the expert testified:

4

"[I]t's not so much using drugs; it's becoming a, quote unquote, known drug user and, therefore, finding yourself on the list." In other words, contrary to the BIA's characterization, the expert's testimony was that a past user need *not* use drugs again in order to be added to the government's list.

The BIA also held that the IJ did not clearly err in finding it unlikely that the government or others in the Philippines would learn of Luna's criminal history or past drug use. In reaching this conclusion, the BIA relied on another misstatement of the record, specifically a misstatement of the expert's testimony. The BIA stated that "the expert witness testified that . . . the respondent's deportee status would not be relevant as she enters society." The expert never testified to that effect. The expert actually testified that as a "newcomer," Luna would be likely to draw attention, and in his declaration, he stated, "Chances are high that a deportee who has used drugs will be placed on a list and targeted for killings because the deportee will attract attention as a newcomer and will most likely be of interest to the police." The expert's statement that "nobody pays attention" to a deportee's status was made in the course of explaining that data is not collected on deportees who have been killed. Read in context, this statement cannot reasonably be interpreted to mean that Luna's status as a deportee will not be relevant to her safety as she enters society in the Philippines.

Finally, the BIA stated that "[t]he Immigration Judge permissibly found inadequate record evidence that the respondent would be unable to find a job or

5

a place to live, which would lead her to abuse substances once more." But the IJ did not find inadequate record evidence on this point. Instead, the IJ *affirmatively* found that Luna would be able to obtain a job and that the government of the Philippines would value her skills. Specifically, the IJ stated:

> The respondent learned how to be [a] landscaper. The respondent also learned how to be a mechanic. In addition to that, the respondent today testified that [she] was even a Tier 1 entry-level counselor and was going to get employment with Berkeley. *The Court finds that these skills would be of immense benefit to the government of the Philippines should she return there and the Court finds that the respondent will hardly have any problem finding a job or employment in the Philippines whether she does speak Tagalog or not.*

The record does support the finding that Luna received some training as a mechanic and landscaper, but the record is replete with uncontradicted evidence that there is almost no drug counseling in the Philippines, that the government does not value rehabilitation of drug addicts, and that the few government treatment programs that do exist involve either detention in military facilities or ineffective approaches such as Zumba classes. Our dissenting colleague concedes that the IJ's statement that Luna's skills "would be of immense benefit to the government of the Philippines" was unsupported by record evidence, but he argues that the BIA permissibly narrowed the IJ's affirmative finding regarding Luna's future job prospects. We disagree. Rather than narrowing the IJ's finding, the BIA recast it. What the IJ found was that "the respondent will hardly have any problem finding a job." This finding was unsupported by the record and the IJ's finding that the government of the

6

Philippines would consider Luna's skills as a drug counselor to be of "immense benefit" so contradicts the record that it compels the conclusion that the IJ did not consider all relevant evidence in the record.[1]

**2. Aggregation of Risk.** "[W]hen an applicant posits a *single* theory for why he would be tortured, but the torture will come about only if several hypothetical events all occur in sequence, an applicant must show, at a minimum, that the individual probability of each event occurring is greater than 50 percent." *Velasquez-Samayoa v. Garland*, 49 F.4th 1149, 1155 (9th Cir. 2022) (citing *Matter of J-F-F-*, 23 I. & N. Dec. 912, 917–19 (A.G. 2006)). But "when an applicant posits *multiple* theories for why he would be tortured, the Agency should consider the aggregate risk posed by all sources and grant CAT relief if the cumulative probability of torture is greater than 50 percent." *Id.* (citing *Cole*, 659 F.3d at 775).

Here, the IJ pointed to *Matter of J-F-F-*, suggesting that Luna relied on a "series of suppositions," and concluded:

> There is no clear probability based on the respondent's current status of at least the last ten years that the respondent will reoffend or that she will not be able to obtain employment. There is also no clear probability that the government of the Philippines or anybody else in the Philippines will learn of her criminal past or even her drug use.

---

[1] To the extent the IJ intended to suggest that the government of the Philippines would find Luna's skills as a mechanic or landscaper to be of "immense benefit," there is also no evidence in the record to support that finding.

Though the IJ provided no indication that she considered both risks in the aggregate, the BIA "agree[d] with the Immigration Judge that the respondent's fear of torture is based on a series of assumptions," citing *Matter of J-F-F-*, and concluded that "[t]he Immigration Judge considered the entire record and the aggregate risk of torture in evaluating all theories the respondent presented about her fear of torture." On this record, the BIA's assertion that the IJ considered the entire record and the aggregate risk cannot overcome the strong "indication[s] that the BIA did not consider all of the evidence before it" because it "misstat[ed] the record" and incorporated unsupported factual findings made by the IJ. *See Cole*, 659 F.3d at 771–72. The BIA reached its decision without the benefit of our recent decision in *Velasquez-Samayoa*, which clarified the requirement that the agency consider the aggregate risk of torture.[2] 49 F.4th at 1155. Because the agency's decisions indicate that it did not consider all the record evidence in reaching key findings that bear directly on the likelihood of Luna relapsing or otherwise winding up on the government's list, we grant the petition and remand to the agency. On remand, the agency will have the opportunity to reassess the record and determine

---

[2] The government argues that *Velasquez-Samayoa* requires aggregation only when the risk of torture comes from more than one possible torturer, but not when there are multiple scenarios by which a petitioner could be tortured by the government. We discern no analytical basis for this distinction and conclude that the agency was required to consider the aggregate risk of torture.

whether Luna met her burden of showing she is entitled to protection under the CAT if all record evidence and the aggregation of risks are considered.

**PETITION GRANTED.**

*Luna v. Garland*, No. 21-182

MILLER, Circuit Judge, dissenting:

Substantial evidence supports the Board's determination that Luna did not show that it is more likely than not that she would be tortured in the Philippines. I would therefore deny the petition for review.

Luna offers two different theories of how she might suffer torture if returned to the Philippines. She argues that she will be killed by the police or by government-supported vigilantes, either (1) because she will relapse into drug use or (2) because she will be falsely suspected of being a drug user. In a thorough opinion, the Board addressed both possibilities. We must accept the agency's findings of fact unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Luna has not met that standard.

First, substantial evidence supports the Board's determination that Luna has demonstrated the ability to remain sober. The Board noted that Luna has not used drugs since 2009, that she has developed coping mechanisms through rehabilitation programs, and that she has various marketable skills that could help her find employment in the Philippines. To be sure, the immigration judge's statement that Luna's skills "would be of immense benefit to the government of the Philippines" does not appear to have a foundation in the record. But the immigration judge also

1

stated more broadly that Luna's fear that she "will not be able to find a job or employment" was "not necessarily supported by the evidence in the record" and was "based on speculation and conjecture." The Board adopted only that latter conclusion, stating that there was "inadequate record evidence that [Luna] would be unable to find a job or a place to live, which would lead her to abuse substances once more." That was not a new factual finding but a permissible narrowing of the findings already made by the immigration judge. *See Shrestha v. Holder*, 590 F.3d 1034, 1039 (9th Cir. 2010) ("When the BIA conducts its own review of the evidence and law rather than adopting the IJ's decision, our review 'is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted.'" (quoting *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006))).

Nothing in the Board's decision suggests that it failed to consider all of the evidence that Luna presented. *See Hernandez v. Garland*, 52 F.4th 757, 771 (9th Cir. 2022) ("In reviewing the Board's order, we apply a 'presumption that the [Board] did review the record.'" (quoting *Fernandez v. Gonzales*, 439 F.3d 592, 603 (9th Cir. 2006))). To the contrary, the Board specifically "acknowledge[d] [Luna's] assertions that, given the scientific realities of addiction and relapse and the absence of effective treatment programs and a strong support system, her propensity to resume substance abuse is a real possibility." But significant though

2

those challenges may be, they do not compel a conclusion contrary to that of the agency.

Second, substantial evidence supports the Board's determination that Luna is unlikely to be placed on a government watch-list and killed if she does not relapse. Luna's expert witness stated that, although Luna would likely attract attention as a newcomer living in a poor area, he was unsure exactly how her criminal history or past drug use would become known. And according to the same witness, there are no known cases of deportees to the Philippines being killed. The Board acknowledged the possibility that Luna might be placed on a government watch-list and killed even if she did not relapse into drug use, but it determined, based on other elements of the expert's testimony, that the likelihood of this occurring was not sufficiently high to merit CAT protection.

Luna argues that the Board mischaracterized the expert's testimony when it stated that the expert "testified that a past drug user must usually first become a known drug user in order to be placed on the watch-list." According to Luna, the Board "conflated 'known drug user' with actual drug user," when the expert meant to say that one can end up on a government watch-list by being "denounced as a 'known drug user'" despite not actually using drugs. But the Board did not say that a "known drug user" is necessarily an actual drug user. In fact, in the preceding sentence, the Board noted that, according to the expert, "some people on the list are

3

not even drug users but are people who crossed an official." And shortly thereafter, the Board acknowledged that "there may be *some* likelihood that [Luna] would be in danger if she does not relapse." The most natural reading of the Board's statement that "[t]he expert . . . testified that a past drug user must usually first become a known drug user in order to be placed on the watch-list" is that, according to the expert, a past drug user must *usually* either relapse *or have her past drug use become known* in order to end up on a government watch-list. That is a reasonable interpretation of the testimony.

Luna also argues that the Board misstated the expert's testimony when it stated that the expert testified that Luna's "deportee status would not be relevant as she enters society." According to Luna, "it is clear that [the expert's] statement that 'nobody pays attention' to legal status was limited to the issue of determining deportee deaths." But one possible interpretation of the testimony is that, even if a deportee would attract attention in her community by virtue of being a *newcomer*, her legal status as a *deportee* would not, in itself, become known or generate suspicion. The Board's statement is consistent with that interpretation.

Nor did the Board fail to consider that Luna might draw attention in the Philippines. Rather, the Board noted that possibility, but it determined that there was inadequate evidence to show that such attention was likely to lead to Luna's past drug use becoming known and to Luna's subsequently being placed on a

4

government watch-list. The Board pointed out that Luna's "removal to the Philippines is not premised on a drug-related crime" and that "the expert witness testified that he does not know if any deportee from the United States has been killed." The Board thus reasonably concluded that, even in light of the expert's testimony, the attention Luna would attract as a newcomer in the Philippines was not likely to lead to her being tortured.

That leaves the question of aggregating the risk from Luna's two different theories. Luna notes that the Board's decision was issued before we decided *Velasquez-Samayoa v. Garland*, 38 F.4th 734 (9th Cir.), *as amended*, 49 F.4th 1149 (9th Cir. 2022). Nonetheless, the Board recognized that the immigration judge was required to examine "the entire record and the aggregate risk of torture in evaluating all theories [Luna] presented," and it determined that the immigration judge had done so. This case is therefore "different from *Velasquez-Samayoa*, in which we held that the Board erred because it expressly stated that in analyzing petitioner's 'two alternative theories of torture,' it had (erroneously) viewed them 'as a [single] "claimed chain of events that would lead to his torture."'" *Hernandez*, 52 F.4th at 773 (brackets in original) (quoting *Velasquez-Samayoa*, 38 F.4th at 739). "In the absence of some contrary indication in the Board's opinion, we do not presume that the Board has disregarded the law—not to mention basic principles of logic and probability." *Id.* We should not do so here.