In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-2254

OLGER G. PERALTA-CABRERA,

*Petitioner,*

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

---

Petition for Review of an Order of the
Board of Immigration Appeals.

---

ARGUED JUNE 6, 2007—DECIDED SEPTEMBER 7, 2007

---

Before RIPPLE, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* This is the second time that we are called to address Olger Peralta-Cabrera's case, in which he petitions for review of the Board of Immigration Appeals's (BIA) decision upholding the immigration judge's (IJ) denial of his motion to reopen. The material facts are not disputed, and although we briefly discussed them in a 2006 order, we recount them here for the sake of clarity.

In November 1994, an IJ in Chicago ordered Peralta-

Cabrera deported[1] *in absentia* to his home country of Ecuador. Eight years later Peralta-Cabrera moved to reopen his deportation hearing, claiming that he failed to appear at the 1994 hearing because he never received a notice of the hearing's time or place. *See* 8 U.S.C. § 1252b(c)(3)(B) (1988). He asked the IJ to rescind his *in absentia* deportation order and also moved to change venue to the immigration court in Bloomington, Minnesota, where he and his family then resided. In a memorandum and affidavit supporting his motion, Peralta-Cabrera expounded upon his claim that he did not receive notice of his 1994 deportation hearing.

Peralta-Cabrera began by explaining that he and a traveling companion named Eloy Espinoza entered the United States (at San Ysidro, California) in July 1994 "without inspection," a euphemistic way of saying they entered illegally. A few days later the duo ended up at O'Hare International Airport in Chicago, Illinois, where agents of the now-defunct Immigration and Naturalization Service (INS) arrested the men for their illegal entry. *See* 8 U.S.C. § 1251(a)(1)(B) (1988). Upon their arrest, Espinoza telephoned his brother-in-law who lived in Chicago—Florentine Arias, a central player in this story—and asked him to come to O'Hare and help him

---

[1] When the Immigration and Naturalization Act (INA) was amended in 1997 by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), one of the many changes made was the substitution of the term "deportation" with "removal*." See Fernandez-Vargas v. Gonzales*, 126 S. Ct. 2422, 2426 n.1 (2006) (citing Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 Colum. L. Rev. 961, 966 (1998)). As we discuss later, Peralta-Cabrera's case is governed by the pre-IIRIRA version of the INA; thus, we will utilize the term "deportation" and its appropriate derivatives. *See id.*; *Ursachi v. INS*, 296 F.3d 592, 594 (7th Cir. 2002).

and Peralta-Cabrera seek their release. While he was detained awaiting Arias's arrival, Peralta-Cabrera spoke with an immigration agent regarding where he would live while his deportation proceedings were pending. He informed the agent that he had never before been to Chicago, had no place in the city to live, and knew no one in the city. Therefore, Peralta-Cabrera stated, he would go with Espinoza to stay with Arias while the proceedings played out.

Meanwhile, Peralta-Cabrera continued, Arias arrived at O'Hare and spoke with immigration agents regarding Peralta-Cabrera's and Espinoza's release. The agents sought from Arias information regarding how the immigration authorities could reach the two men to provide them with information regarding their upcoming deportation hearings; Arias responded that both men would stay at his apartment in Chicago's Wrigleyville neighborhood—841 West Cornelia Street, Chicago, Illinois, 60657. The agents with whom Arias spoke used that address when completing a variety of administrative forms regarding Peralta-Cabrera's arrest and release; among these forms was the agency's Order to Show Cause, the document upon which immigration authorities would rely to obtain Peralta-Cabrera's contact information so they could, in turn, mail to him notice of the time and place of his deportation hearing.

After the paper work was completed, Peralta-Cabrera further recounted, an immigration agent reviewed the forms with him and asked if his contact information—that is, the Cornelia Street address provided by Arias—was correct; Peralta-Cabrera responded that it was. The agent then informed Peralta-Cabrera that in a few weeks immigration authorities would mail to Arias's address a hearing notice that contained information regarding the time and place of his upcoming deportation hearing.

Peralta-Cabrera was then released. He proceeded to take up residence in Arias's apartment on Cornelia Street, as he said he would. However, he never received the hearing notice, or, for that matter, any other document regarding his deportation hearing.

Having received no word from immigration authorities, Peralta-Cabrera stated that in late 1994 he packed up his possessions and traded Wrigleyville for the Minneapolis-St. Paul area in Minnesota. Time passed, and in 2002 Peralta-Cabrera's employer submitted a petition for an immigrant visa on his behalf. After the visa was granted, Peralta-Cabrera applied to adjust his status to a permanent resident. However, the INS denied Peralta-Cabrera's application, saying he was ineligible to adjust his status. The INS cited unspecified information submitted with his employer's visa petition and equally unspecified "related files." Curious as to what would prevent him from adjusting his status, Peralta-Cabrera obtained a copy of his immigration file, which contained many documents that, until that moment, he did not know existed. Specifically, the file contained a photocopy of a hearing notice dated August 10, 1994, stating that a deportation hearing before an IJ was scheduled for November 23, 1994. Attached to the notice were two documents. The first document was a copy of a receipt for certified mail, showing that the notice was mailed the same day that it was issued and that it was addressed to the following recipient: "Peralta-Cabrera, Olger Gonzalo, 841 West Cornelia, Chicago, IL 60657." Also attached to the notice was a copy of an envelope bearing a stamp that read: "RETURN TO SENDER—ATTEMPTED NOT KNOWN," and handwritten notes reading "UNK" (presumably short for "unknown") and "8/12/94." The file also contained the IJ's decision of November 23, 1994, in which he ordered Peralta-Cabrera deported *in absentia*; attached to the decision was another photocopy of a receipt

for certified mail, showing that the decision was mailed on the same day it was issued to the same address as the hearing notice, and another photocopy of an envelope, bearing both a postmark of November 23, 1994, and another "ATTEMPTED NOT KNOWN" stamp.

Confused as to why the hearing notice was not delivered to him in Chicago when it was sent to the address he provided to the immigration agents, Peralta-Cabrera stated that he contacted Arthur Roxas, an attorney with the U.S. Postal Service, to see if he could shed some light on the matter. After Peralta-Cabrera described the documents in his immigration file, Roxas informed him that, under Postal Service regulations, mail addressed to a person who does not reside at an address, but is merely visiting the address, will not be delivered unless the mail is addressed "in care of" the individual whom he is visiting. Roxas also provided Peralta-Cabrera with the Postal Service internal regulations setting forth the policy. Armed with this information, Peralta-Cabrera moved to reopen his deportation proceedings on the basis that he never received notice.

Although the IJ accepted Peralta-Cabrera's version of the facts, he nevertheless denied the motion to reopen, reasoning that it was solely Peralta-Cabrera's responsibility to specify that his mail needed to be addressed to him "in care of" Arias, and thus "he can be 'charged' with receiving notice which was sent to the only address he provided." Peralta-Cabrera appealed to the BIA, which upheld the denial of the motion to reopen. Like the IJ, the BIA had no issue with the facts as presented by Peralta-Cabrera but echoed the IJ's determination that Peralta-Cabrera was properly charged with receiving the notice.

Peralta-Cabrera then petitioned us to review the BIA's decision. While his petition was pending, however, Peralta-Cabrera was deported back to Ecuador. We nevertheless

addressed the case, but instead of assessing the merits of Peralta-Cabrera's arguments we accepted the government's suggestion to remand the case to the BIA so it could examine whether Peralta-Cabrera could be charged with receiving notice of his deportation hearing under our then-recently announced decision in *Sabir v. Gonzales*, 421 F.3d 456 (7th Cir. 2005). We accordingly ordered the BIA to examine whether, under *Sabir*, Peralta-Cabrera thwarted the Postal Service's attempts to deliver the notice and, if not, whether the motion to reopen should be granted on the basis that he did not receive notice. *See Peralta-Cabrera v. Gonzales*, 161 F. App'x 594, 595 (2006) (unpublished opinion).

On remand, the BIA again upheld the IJ's denial of Peralta-Cabrera's motion to reopen. The BIA first noted that it lacked jurisdiction to address Peralta-Cabrera's case because his deportation constituted a withdrawal of his motion to reopen. *See In re G-N-C-*, 22 I. & N. Dec. 281 (B.I.A. 1998). However, this determination did not keep the BIA from concluding that Peralta-Cabrera thwarted service of his hearing notice by not informing the INS agents at the time of his arrest that his mail needed to be addressed to him "in care of" Arias; as the BIA stated, "[i]t was not the INS' responsibility to guess that the addition of those words might be necessary." The BIA accordingly dismissed Peralta-Cabrera's appeal.

Which brings us to today, with Peralta-Cabrera again petitioning us to review the BIA's decision upholding the IJ's denial of his motion to reopen. Before we reach the merits of Peralta-Cabrera's arguments, however, the BIA's terse disavowal of jurisdiction requires us to address a vital (and thorny) issue: whether Peralta-Cabrera's case remains justiciable in light of the fact that he no longer is in the United States. This examination first requires us to determine whether the Immigration

and Naturalization Act (INA) provides a basis for us to exercise subject matter jurisdiction. Under the provisions of the INA applicable to Peralta-Cabrera's case, we conclude that it does.

As we recounted earlier, the IJ entered its order of deportation in November 1994. This, in turn, means that his petition for review is governed by the INA as it existed before it was amended in April 1997 by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). *See* Pub. L. No. 104-208, § 309(a), (c)(1), 110 Stat. 3009-546, 3009-625 (1997) (stating that IIRIRA generally does not apply to aliens "in exclusion or deportation proceedings" before effective date); *Fernandez-Vargas v. Gonzales*, 126 S. Ct. 2422, 2432 (2006); *Nwaokolo v. INS*, 314 F.3d 303, 305-06 (7th Cir. 2002) (per curiam). The pre-IIRIRA provisions of the INA deprived the federal courts of appeals of jurisdiction to address any petition for review when the petitioner had "departed from the United States." *See* 8 U.S.C. § 1105a(c) (1988); *Sofinet v. INS*, 188 F.3d 703, 708 (7th Cir. 1999); *see also In re G- N- C-*, 22 I. & N. Dec. at 288 (applying pre-IIRIRA version of INA to determine lack of jurisdiction to address motion to reopen 1991 deportation proceedings). At first blush, then, it appears that we lack jurisdiction to address Peralta-Cabrera's petition for review because of his deportation. Not so; in fact, this is where things get interesting. Federal appellate courts have interpreted the term "departure" to mean only "legally executed departures"; thus, jurisdiction over a petition for review is not removed if the petitioner's departure was due to unlawful government action. *See Joehar v. INS*, 957 F.2d 887, 889-90 (D.C. Cir. 1992); *Zepeda-Melendez v. INS*, 741 F.2d 285, 287 (9th Cir. 1984); *Juarez v. INS*, 732 F.2d 58, 59-60 (6th Cir. 1984); *see also Marrero v. INS*, 990 F.2d 772, 777 (3d Cir. 1993) (stating court has jurisdiction when petitioner also presents colorable due process claim). Our jurisdiction thus rests on

whether Peralta-Cabrera's deportation was "legally executed," and, as we will see, it was not.

With exceptions not pertinent here, under the pre-IIRIRA version of the INA an alien who served a petition for review on the Attorney General and relevant immigration authorities automatically was granted a stay of deportation pending the resolution of the petition. *See* 8 U.S.C. § 1105a(a)(3) (1988 & Supp. V 1993); *Sofinet*, 188 F.3d at 705 (noting that IIRIRA replaced provision granting automatic stay with provision requiring petitioner affirmatively requesting stay). The record shows that on November 19, 2004—ten days before he was deported— Peralta-Cabrera served upon both the Attorney General and correct immigration authorities his first petition for review of the BIA's decision upholding the IJ's denial of his motion to reopen. (This petition, as we have noted, led us to remand the case to the BIA with instructions to consider the case in light of *Sabir*.) The deportation order entered against Peralta-Cabrera thus should have been stayed pending the outcome of his petition for review, *see* 8 U.S.C. § 1105a(a)(3) (1988 & Supp. V 1993); *Sofinet*, 188 F.3d at 705, and yet, disturbingly, he was deported. Because the government ran afoul of the applicable pre-IIRIRA provisions of the INA by prematurely deporting him, *cf. Bejar v. Ashcroft*, 324 F.3d 127, 132 (3d Cir. 2003), we cannot say that Peralta-Cabrera's departure was "legally executed." Thus, under the INA we have jurisdiction over his petition for review, his deportation notwithstanding. *See Marrero*, 990 F.2d at 777; *Joehar*, 957 F.2d at 889; *Zepeda-Melendez*, 741 F.2d at 287.

Our discussion, unfortunately, does not end there; although the INA gives us jurisdiction over Peralta-Cabrera's case, we nevertheless may not address his petition for review if his deportation renders his case moot. *See Spencer v. Kemna*, 523 U.S. 1, 7-8 (1998); *A.M. v. Butler*, 360 F.3d 787, 790 (7th Cir. 2004) ("[A] federal court

at any stage of the proceedings must, on its own, dismiss a case as moot when it cannot give the petitioner any effective relief."). A case is moot when the parties fail to "continue to have a 'personal stake in the outcome'" of the legal action in question, *see Spencer*, 523 U.S. at 7 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990)), meaning here that for his case to remain justiciable, Peralta-Cabrera "must have suffered, or be threatened with, an actual injury traceable to the [government] and likely to be redressed by a favorable judicial decision," *see Lewis*, 494 U.S. at 477; *A.M.*, 360 F.3d at 790. Because Peralta-Cabrera is no longer subject to deportation (after having already been deported) and is not detained by the INS, his deportation thus must yield some collateral consequences to present a live and cognizable issue. *See Tapia Garcia v. INS*, 237 F.3d 1216, 1217 (10th Cir. 2001); *see also A.M.*, 360 F.3d at 790.

Under the INA's current admissibility provisions, *see Fernandez-Vargas*, 126 S. Ct. at 2432 n.11, collateral consequences exist. Specifically, Peralta-Cabrera may not seek readmission to the United State for five years from the date he was deported. *See* 8 U.S.C. § 1182(a)(6)(B) (2004); *cf.* 8 U.S.C. § 1182(a)(6)(B) (1988) (barring deported aliens from seeking readmission for five years unless they first obtain Attorney General's permission); *Labojewski v. Gonzales*, 407 F.3d 814, 822 n.5 (7th Cir. 2003); *Tapia Garcia*, 237 F.3d at 218. Peralta-Cabrera likewise is hindered from adjusting his immigration status, as he originally sought to do, until the five years have expired or he obtains the Attorney General's permission to apply early, which, we think, is extremely unlikely. *See Lopez-Flores v. Dep't of Homeland Sec.*, 387 F.3d 773, 777 & n.4 (7th Cir. 2004) (citing 8 C.F.R. § 212.2(a)). These consequences of Peralta-Cabrera's deportation are concrete disadvantages imposed on him as a matter of law, *see Max-George v. Reno*, 205 F.3d 194, 196 (5th Cir. 2000);

*Gao v. Jenifer*, 185 F.3d 548, 557 (6th Cir. 1999), and which a favorable decision from us can begin to redress. For instance, we can grant Peralta-Cabrera's petition for review and remand the case with instructions to reopen his deportation hearings, which, in turn, would allow him the opportunity to challenge his deportation, and potentially the chance to seek readmission or adjustment of status. Thus, despite his deportation, Peralta-Cabrera's petition for review presents a live case and controversy for us to address. *See Tapia Garcia*, 237 F.3d at 218; *see also A.M.*, 360 F.3d at 790.

The justiciablility of Peralta-Cabrera's appeal now established, we move, finally, to the merits of his claim. Peralta-Cabrera argues that the BIA incorrectly upheld the IJ's denial of his motion to reopen by erroneously determining that he thwarted delivery of his hearing notice solely by not stating that the notice needed to be addressed to him "in care of" Arias. Where, as here, the BIA undertook an independent review of the record, we review the BIA's decision directly. *See Korniejew v. Ashcroft*, 371 F.3d 377, 382 n.7 (7th Cir. 2004). We normally review a decision upholding the denial of a motion to reopen for abuse of discretion, *see Ursachi v. INS*, 296 F.3d 592, 594 (7th Cir. 2002), but because the issue of whether an alien received notice of his deportation hearing implicates notions of due process, our examination is *de novo*, *Nazarova v. INS*, 171 F.3d 478, 482 (7th Cir. 1999).

An alien seeking to challenge a deportation order entered *in absentia* has but one option: to move to reopen the hearing that resulted in the order. *See* 8 U.S.C. § 1252b(c)(3) (1988); *In re Gonzalez-Lopez*, 20 I. & N. Dec. 644, 645-46 (B.I.A. 1993). As pertinent here, the alien can bring the motion at any time if he shows that he did not appear at the deportation hearing because he failed to receive proper notice of the hearing. *See* 8 U.S.C.

§ 1252b(c)(3)(B) (1988). That is not to say that an alien can "make himself unreachable, and then later ask to have his case reopened because he did not receive notice," *Sabir*, 421 F.3d at 459. He cannot. Rather, where the evidence establishes that the alien "thwarted delivery" of the notice, he can be charged with having received it. *See id.*; *Wijeratne v. INS*, 961 F.2d 1344, 1347-48 (7th Cir. 1992); *cf.* 8 U.S.C. § 1252b(c)(2) (1988) (eliminating notice requirement where alien fails to provide contact information).

In addressing whether Peralta-Cabrera received notice of his deportation hearing, the parties devote substantial portions of their briefs discussing whether the notice itself satisfied statutory and constitutional requirements. However, these arguments are misplaced. The issue of whether notice was proper pertains to only whether the IJ's *in absentia* deportation order was correct; an issue, as we repeatedly have explained, that is separate from whether the IJ should have rescinded the order upon a motion to reopen because the alien received no notice of the hearing. *See* 8 U.S.C. § 1252b(c)(3)(B) (1988); *Joshi v. Ashcroft*, 389 F.3d 732, 736 (7th Cir. 2004) (stating that with motions to reopen based on lack of notice "the issue is not notice but receipt, because the statute allows an alien ordered removed in an *absentia* proceeding to reopen the proceeding if he did not receive notice even if the notice that was sent, whether or not it was received, satisfied statutory and constitutional requirements"); *see also Sabir*, 421 F.3d at 458-59; *Pervaiz v. Gonzales*, 405 F.3d 488, 492 (7th Cir. 2005); *Gurung v. Ashcroft*, 371 F.3d 718, 722 (10th Cir. 2004) ("Considerations on a motion to reopen differ from those relevant to the holding of an *in absentia* hearing. A motion to reopen focuses on whether the alien actually received notice, rather than on whether the INS sent sufficient notice to the proper address."). Thus, our review is confined to whether

Peralta-Cabrera received notice of his hearing and, if not, whether he can be charged with receiving the notice because he "made himself unreachable."

With that said, it is undisputed that Peralta-Cabrera did not receive the hearing notice; after all, the record contains the envelope of the notice stamped "ATTEMPTED NOT KNOWN." The question is whether Peralta-Cabrera can be charged with receiving the notice because he "made himself unreachable." We start with what the parties agree Peralta-Cabrera did and did not do in "making himself unreachable." Both sides agree that he informed immigration agents that he would reside with Arias at the Cornelia Street address and that the address was correct and not falsified in an attempt to evade contact with immigration authorities. The parties further agree that Peralta-Cabrera never refused service of the notice; again, there can be no contention on this point because the record contains the notice that was never delivered, and there is no evidence suggesting that immigration authorities attempted to serve the notice in person. Perhaps most importantly, however, the parties agree that when immigration authorities attempted to serve Peralta-Cabrera with notice *via* certified letter, he was residing exactly where he stated he would be: around the corner from Wrigley Field at 841 West Cornelia, Chicago, Illinois, 60657.

So far, so good. But given that at all times pertinent immigration authorities knew, or should have known, where Peralta-Cabrera was residing, how exactly does the government contend he "made himself unreachable"? The government echoes the BIA's stance that Peralta-Cabrera thwarted delivery simply by failing to inform the immigration agents that all mail must be addressed to him "in care of" Florentine Arias. According to the government, because the INA required Peralta-Cabrera to provide an address where his hearing notice could be sent, the

responsibility fell on him to "inform the INS of the additional language" essential for delivery. As the government states, Peralta-Cabrera "was in the best position to provide the complete address," and because he did not, he "made himself unreachable."

We have no quarrel with the government's assertion that an alien has a duty to provide immigration authorities with an address where he can be contacted. *See* 8 U.S.C. § 1252b(a)(1)(F) (1988); *In re Grijalva*, 21 I. & N. Dec. 27, 33 (B.I.A. 1995) ("It is incumbent upon the [alien] to provide an address where he can receive mail in a regular and timely manner."). We fail to understand, though, how that duty translates into the additional burden of ensuring that the government will properly address a hearing notice mailed to the alien. The government contends that this is so because the alien is "in the best position" to direct the government how to address the hearing notice. But this assertion runs counter to the INA's mandate that it is the government's duty to ensure that hearing notices are successfully "given" to the alien, *see* 8 U.S.C. § 1252b(a)(2)(A) (1988), as well as the notion that, in most instances, it is the government's responsibility to ensure that notice by mail is successfully delivered, *see, e.g.*, *Jones v. Flowers*, 126 S. Ct. 1708, 1716-21 (2006) (holding notice of impending tax sale of property was not reasonably calculated to reach property owner when notice sent *via* certified letter by state was returned unclaimed and state did not take additional reasonable steps to ensure notice was provided); *Terezov v. Gonzales*, 480 F.3d 558, 555-56 (7th Cir. 2007) ("It is an abuse of discretion to refuse to rescind an *in absentia* order of removal and reopen the proceedings when the record shows that the [Department of Homeland Security] sent the alien's Notice to Appear to an incorrect or old address."); *Singh v. Gonzales*, 412 F.3d 1117, 1121-22 (9th Cir. 2005) (concluding that denial of

motion to reopen was an abuse of discretion where evidence showed that immigration authorities sent a hearing notice to an old address).

We think the government, not the alien, is "in the best position" to know how to properly address a hearing notice. We cannot see why an alien, having just arrived in the United States, is "in the best position" to instruct immigration agents how to address correspondence to him when he tells them where he is staying and *who* he is staying with. We find it difficult to believe that if an alien provided an incomplete mailing address under any other circumstances—say, an address devoid of a street name, zip code, or even the name of a city—an immigration agent could sit idly by and accept the information on the assumption that it was correct. To say that an alien is "in the best position" to know how to address mail expects too much of the alien and suggests that the government is incapable of properly utilizing the postal system. And because the government is, instead, the party "in the best position" to know how to properly address correspondence to an alien, once an alien satisfies his duty under the INA and provides an address where he can be contacted, it is the government's responsibility to ensure that mail is properly addressed so that it can be delivered to the location the alien provided. *Cf. Jones,* 126 S. Ct. at 1716-21; *Terezov*, 480 F.3d at 555-56; *Singh*, 412 F.3d at 1121-22.

Here, Peralta-Cabrera informed the government that he would be staying with Arias while his deportation proceedings were pending and provided the address of Arias's apartment. The responsibility accordingly fell on the government to ensure that the hearing notice would be delivered to the address Peralta-Cabrera provided, *cf. Jones,* 126 S. Ct. at 1716-21; *Terezov,* 480 F.3d at 555-56; *Singh*, 412 F.3d at 1121-22, and the government, we

think, under these facts, had the responsibility to address the notice to Peralta-Cabrera "in care of" Arias.

As an aside, it is difficult to take seriously the government's contention that Peralta-Cabrera "thwarted" service of his hearing notice when it could have, at any time, served the notice on him in person but failed to do so. The INA explicitly allows hearing notices to be served personally on the alien or, where appropriate, the alien's representative. *See* 8 U.S.C. § 1252b(a)(2)(A) (1988). And although it is "not our responsibility to prescribe the form of service that the [government] should adopt," *see Jones*, 126 S. Ct. at 1721 (quoting *Greene v. Lindsey*, 456 U.S. 444, 455 n.9 (1982)), perhaps in this case personal service would have been appropriate (and easier to accomplish than service by mail) since immigration authorities knew that Peralta-Cabrera was residing at Arias's apartment. Or, perhaps better yet, the government could have provided Peralta-Cabrera with notice of his hearing when immigration agents detained him at O'Hare; initial court dates are routinely set at the time that people are arrested, and we fail to understand why that docketing procedure cannot translate to the immigration context. But that aside, because the government opted instead to serve Peralta-Cabrera with his hearing notice *via* certified mail, it had the responsibility to ensure that the notice would be delivered to the address he provided.

Peralta-Cabrera's petition for review is GRANTED. The case is REMANDED to the BIA with instructions to grant Peralta-Cabrera's motions to reopen and to vacate his *in absentia* deportation order. We express no opinion regarding his motion to transfer venue.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*