**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-2107**

---

GILFREDO LOPEZ-SORTO,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

---

On Petition for Review of an Order of the Board of Immigration Appeals.

---

Argued:  December 6, 2023                    Decided:  May 31, 2024

---

Before RICHARDSON, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

---

Petition for review denied by published opinion.  Judge Richardson wrote the opinion, in which Judges Quattlebaum and Benjamin joined.

---

**ARGUED:**  Benjamin James Osorio, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioner.  Brendan Paul Hogan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Alexandra M. Williams, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioner.  Brian Boynton, Principal Deputy Assistant Attorney General, Cindy S. Ferrier, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

RICHARDSON, Circuit Judge:

Gilfredo Lopez-Sorto petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming an Immigration Judge's ("IJ") decision denying him deferral of removal under the Convention Against Torture ("CAT"). He argues that the IJ and BIA used the wrong legal standard to evaluate his claim, failed to aggregate his various asserted risks of torture, and ignored his experts' testimony. We disagree. Accordingly, we deny the petition for review.

## I.    BACKGROUND

Lopez-Sorto, a nearly fifty-year-old Salvadoran native, was admitted to the United States as a lawful permanent resident in 1982, when he was eight years old. Ten years later, he joined the "El Palo" street gang. As a member of this gang, he got into a fight with members of a rival gang in Washington, D.C., in 1995. The fight began in a club, but it turned into a car chase as members of the opposing gang pursued Lopez-Sorto through the city. When traffic caused Lopez-Sorto to stop, his pursuers caught up to him in their car. Lopez-Sorto then got out of his car, approached his rivals' car, and killed one of the occupants by shooting into the driver's window.

As a result, Lopez-Sorto was convicted of second-degree murder while armed, assault with intent to kill while armed, possession of a firearm during a violent crime, and carrying a pistol without a license. He was sentenced to prison for a period of twenty-two to sixty-five years and served twenty-six years, during which his gang disbanded and he claims to have left gang life behind. His incarceration ended in 2021.

2

After completing his prison sentence, Lopez-Sorto was transferred to U.S. Immigration and Customs Enforcement ("ICE") custody and served with a Notice to Appear, which initiated removal proceedings against him. The Notice asserted that Lopez-Sorto was removable under the Immigration and Nationality Act for having committed an aggravated felony and an enumerated firearm offense. *See* 8 U.S.C. § 1227(a)(2)(A)(iii), (a)(2)(C). Lopez-Sorto did not challenge his removability. He sought the only relief available: deferral of removal under the CAT.[1]

At his hearing, Lopez-Sorto testified to his fear that he would be tortured should he be deported to El Salvador. According to him, his many gang-related tattoos and criminal record mark him as a potential gang member. And that would draw the attention of Salvadoran authorities, anti-gang vigilante "death squads," and street gangs like MS-13 and M-18, likely leading to his torture at each entity's hands.

The IJ disagreed with Lopez-Sorto, concluding that he had not established that he would more likely than not be tortured should he return to El Salvador. So the IJ ordered that Lopez-Sorto be removed to El Salvador and denied his application for deferral of removal under the CAT. Lopez-Sorto appealed only the IJ's denial of CAT protection, but the BIA affirmed the IJ's decision and dismissed the appeal. This prompted Lopez-Sorto

---

[1] Deferral of removal under the CAT is a limited form of immigration relief that only prevents removable aliens from being removed to a particular country where it is more likely than not that they will be tortured. *Nasrallah v. Barr*, 590 U.S. 537, 580 (2020). It does not grant a standalone right for aliens to remain in the United States indefinitely, nor does it upset or rescind any outstanding orders of removal. *Id.* at 582. On the contrary, an alien who has attained CAT protections still "may be removed at any time to another country where he or she is not likely to be tortured." 8 C.F.R. §§ 1208.17(b)(2), 1208.16(f).

3

to timely petition this Court for review under 8 U.S.C. § 1252, again challenging only the IJ's decision to deny his application for deferral of removal.

While his petition for review was pending, however, Lopez-Sorto failed to ask for a stay of removal. So the government carried out the IJ's order mandating that Lopez-Sorto be removed from the country. Therefore, on October 8, 2021, Lopez-Sorto was removed to El Salvador.

## II.    JURISDICTION

Lopez-Sorto's 2021 removal raises a natural question: Is this case moot? Article III limits a federal court's jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. But whether a suit is a "case" or "controversy" is not measured solely at the time the litigation began; instead, "an actual controversy must be extant at all stages of review." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). The doctrine of mootness establishes that federal courts lack jurisdiction "[w]hen a case or controversy ceases to exist—either due to a change in the facts or the law." *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017). And a case or controversy ceases to exist "when it is impossible for a court to grant any effectual relief whatever to the prevailing party."[2] *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (internal quotations omitted).

---

[2] "Because mootness implicates our Article III jurisdiction, we have an obligation to address it *sua sponte*." *Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 292 (4th Cir. 2022). Accordingly, even though both parties now argue that this case remains a live controversy, we cannot simply take them at their word.

For jurisdiction to exist, we must determine that a favorable decision from us would possibly grant "effectual relief" to Lopez-Sorto. Whether we can grant "effectual relief," however, turns on what relief the party is seeking. Here, Lopez-Sorto ultimately seeks CAT protection—*i.e.*, deferral of removal. Of course, we can't give him that relief directly, even if we hold in his favor. Our power is limited to vacating the BIA's decision and remanding to the agency. Only if the *agency* eventually holds in Lopez-Sorto's favor would he receive his requested relief. But the possibility that the agency may exercise its discretion to deny Lopez-Sorto relief does not mean his case is moot. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998). Rather, Lopez-Sorto's case remains a live Article III controversy unless we "'*know*[]' that [the] agency will not grant" him the relief he seeks. *Townes v. Jarvis*, 577 F.3d 543, 548 (4th Cir. 2009) (quoting *Akins*, 524 U.S. at 25).

At first blush, it would seem logical, if not inevitable, to conclude that the agency will not grant him that relief. Lopez-Sorto asks the BIA to *defer* his *removal*. That is, he asks the government not to rescind his removal but merely to forbear from or delay removing him to El Salvador. But he has already been removed. There is no longer any pending removal to defer. The agency not only won't defer his removal; it can't. His requested relief would thus seem to be a logical impossibility. Precisely for this reason, some of our sister circuits have recognized that, "[i]n cases challenging a BIA decision, the petitioner's removal from the United States generally renders the petition moot." *Mendoza-Flores v. Rosen*, 983 F.3d 845, 847 (5th Cir. 2020); *Peralta-Cabrera v. Gonzales*, 501 F.3d 837, 842–43 (7th Cir. 2007).

5

But Lopez-Sorto points us to ICE's Facilitation of Return Policy ("Directive").[3]

According to Lopez-Sorto, should we grant his petition, ICE could facilitate his return to

the United States. Under the Directive, facilitation of return is defined as "engag[ing] in

activities which allow a lawfully removed alien to travel to the United States (such as by

issuing a Boarding Letter to permit commercial air travel) and, if warranted, parol[ing] the

alien into the United States upon his or her arrival at a U.S. port of entry." Directive ¶ 3.1.

Thus, if applicable, the Directive might allow ICE to restore Lopez-Sorto's physical

presence in the United States. And since he would then be physically present in the country

while still subject to an order of removal, there *would* be a pending removal that the agency

*could* defer. And if that were so, the case might not be moot.

To determine whether Lopez-Sorto's case is moot, therefore, we must determine

whether he may be returned under the Directive. The parties argue that he may and, on

this record, we must agree that it is possible.

The Directive's operative paragraph states:

Absent extraordinary circumstances, if an alien who prevails before the U.S.
Supreme Court or a U.S. court of appeals was removed while his or her
[petition for review] was pending, ICE will facilitate the alien's return to the
United States if either the court's decision restores the alien to lawful
permanent resident (LPR) status, or the alien's presence is necessary for
continued administrative removal proceedings. ICE will regard the returned
alien as having reverted to the immigration status he or she held, if any, prior
to the entry of the removal order and may detain the alien upon his or her
return to the United States. If the presence of an alien who prevails on his or

---

[3] ICE Policy Directive Number 11061.1: Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012), https://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_ return.pdf [https://perma.cc/8FL9-AML2].

her [petition for review] is not necessary to resolve the administrative proceedings, ICE will not facilitate the alien's return. However, if, following remand by the court to the Executive Office for Immigration Review (EOIR), an alien whose [petition for review] was granted and who was not returned to the United States is granted relief by EOIR or the Department of Homeland Security (DHS) allowing him or her to reside in the United States lawfully, ICE will facilitate the alien's return to the United States.

Directive ¶ 2.

Though phrased somewhat inartfully, the Directive applies in three scenarios. First, ICE may facilitate an alien's return to the United States when a favorable decision on a petition for review "restores the alien to lawful permanent resident (LPR) status." *Id.* Second, the Directive permits returning an alien when "the alien's presence is necessary for continued administrative removal proceedings." *Id.* And third, if "an alien whose [petition for review] was granted and who was not returned to the United States is granted relief [by the agency] allowing him or her to reside in the United States lawfully, ICE will facilitate the alien's return to the United States." *Id.*

As to the first scenario, a favorable decision from us will not "restore the alien to lawful permanent resident (LPR) status." LPR status is "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20). The BIA has concluded that LPR status "changes" when the BIA affirms an order of removal against an alien. *In re Lok*, 18 I&N Dec. 101, 105–06 (B.I.A. 1981). And we have adopted that position. *Nwolise v. INS*, 4 F.3d 306, 310–11 (4th Cir. 1993) ("[Removal] orders become final and thus effect a change in lawful permanent residence status at the time that they become 'administratively final,' that is, when the Board affirms

7

an immigration judge's order of deportation or an alien, having suffered an order of deportation, allows the time for filing an appeal with the Board to run.").[4]

In this case, Lopez-Sorto did not seek review of his removability before the BIA, nor does he ask us to review that decision. Therefore, Lopez-Sorto lost his LPR status, at the latest, when the BIA affirmed the IJ's decision. And nothing we do here would possibly affect that administratively final order. Lopez-Sorto only challenges the agency's denial of CAT protection. Were we to rule in his favor, only the BIA's decision on CAT protection would be impacted. *See Nasrallah*, 590 U.S. at 581–82 (noting that, while removal and CAT orders may be reviewed concurrently, "ruling on a CAT claim does not affect the validity of the final order of removal"). Accordingly, a favorable decision from us will not upset the removal order against Lopez-Sorto, and he will not regain his LPR status. Thus, the Directive does not apply to Lopez-Sorto under its first avenue of applicability.

---

[4] There might be some tension between *Nwolise* and the Supreme Court's intervening decision in *Barton v. Barr*, 140 S. Ct. 1442 (2020). In *Barton* , the Court held that "the text of the law requires that" an alien become "inadmissible" at the moment "he is convicted of or admits" certain statutorily listed offenses. *Id.* at 1450 (quoting 8 U.S.C. § 1182(a)(2)(A)(i)). Here, we note that the text of § 1227(a)(2)(A)(iii) specifies that "[a]ny alien convicted of an aggravated felony at any time after admission is deportable." Thus, under *Barton*, Lopez-Sorto became "deportable" at the moment of his conviction. *See* 140 S. Ct. at 1450. But that leaves open the question of whether being deportable alone constitutes a "change" to a lawful permanent resident's "status of having been lawfully accorded the privilege of residing permanently in the United States," *see* § 1101(a)(20), especially in light of § 1227(a)'s provision that removal under that section requires "the order of the Attorney General." But since we need not decide this question to resolve the issue before us, we assume that *Nwolise* still provides the governing framework.

The Directive similarly does not apply in its third scenario because, even if we were to rule in Lopez-Sorto's favor, he would not be "granted relief . . . allowing him . . . to *reside* in the United States lawfully." Directive ¶ 2 (emphasis added). As Lopez-Sorto acknowledges, he is only eligible for one form of relief—deferral of removal under the CAT. Would, then, such a deferral order permit Lopez-Sorto "to reside in the United States lawfully"? While that may be so in some cases, the answer here is no. Remember, for Lopez-Sorto to have some kind of removal to defer, logically, he must first be present in the country. And under these facts, the only possible way for Lopez-Sorto to be physically present in the country is through the Attorney General's parole power, 8 U.S.C. § 1182(d)(5)(A), which cannot lead to an order permitting lawful residence.

To understand this, one needs to recognize that there are three ways through which an alien can cross the border into the country. The first method is admission. The immigration laws define "admission" as "the lawful entry of [an] alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). This is how most aliens enter the country. But some aliens cross the border illegally, committing an "improper entry." *See* § 1325(a). This second method arises, for example, when an alien crosses the border into the country without authorization and without going through the regular procedures of admission. *Id.* There is a third method, however, for an alien whose physical presence in the United States is legally authorized yet which does not constitute an admission. That is parole. Under § 1182(d)(5)(A), the Attorney General may "in his discretion parole into the United States . . . for urgent humanitarian reasons or significant public benefit any alien applying for

9

admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien."

None of these three methods would permit Lopez-Sorto to reside in the United States even were he to receive the relief he requests from us. First, he could not be admitted into the country. Congress has declared some aliens "inadmissible," barring them from the privilege of being lawfully admitted. 8 U.S.C. § 1182(a). This includes aliens "convicted of 2 or more offenses for which the aggregate sentences to confinement were 5 years or more," like Lopez-Sorto.[5]    § 1182(a)(2)(B). Accordingly, Lopez-Sorto cannot gain physical presence in the country through admission.[6]

Next, Lopez-Sorto does not argue that he might establish a physical presence in this country through improper entry. Nor could he. The possibility that a party may violate the law cannot prevent a case from being moot. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) ("[W]e are nonetheless unable to conclude that the case-or-controversy requirement is satisfied by general assertions or inferences that in the course of their activities

---

[5] As discussed above, the language of the statute shows that inadmissibility attaches at the moment of conviction, not from some later adjudication in a removal proceeding. *See Barton*, 140 S. Ct. at 1450 ("[A] noncitizen is rendered 'inadmissible' when he is convicted of or admits the offense."). As a result, Lopez-Sorto's inadmissible status is not a collateral consequence of the removal proceedings below. *Cf. Castendet-Lewis v. Sessions*, 855 F.3d 253, 260 (4th Cir. 2017) (noting that collateral consequences of an immigration proceeding can defeat mootness).

[6] There is a possibility that inadmissible aliens may be admitted when they are mistakenly authorized to enter the country by an immigration officer. *See In re Quilantan*, 25 I&N Dec. 285, 291 (B.I.A. 2010). But for purposes of mootness, we assume that people will comply with the law. *See Spencer v. Kemna*, 523 U.S. 1, 15–16 (1998). That possibility, therefore, is not one that defeats mootness.

10

respondents will be prosecuted for violating valid criminal laws.    We assume that respondents will conduct their activities within the law . . . .").

The only way for Lopez-Sorto to be physically present in this country, therefore, is through the Attorney General's parole power.  Indeed, the Directive itself is an exercise of that power.  Directive ¶ 6.2.  But an important legal caveat attaches to a parolee's status: He or she is "regarded as stopped at the boundary line."  *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958) (quoting *Kaplan v. Tod*, 267 U.S. 228, 230 (1925)).  Legally, parolees are treated as though they have not effected an "entry" into the country at all.  *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020).  And in the absence of an "entry," the Supreme Court has concluded that an alien can neither "dwell" nor "reside" within the United States, as those words are understood in the immigration context. *Kaplan*, 267 U.S. at 229–30.

So even were Lopez-Sorto granted CAT protection, that would not qualify as an order granting him lawful residence in the country.  He could only be brought back into the United States via the parole power, and physical presence within the country pursuant to the parole power does not legally constitute entry; it thus cannot legally lead to residence. *See id.*  This cuts off the Directive's third avenue of application.

Still, Lopez-Sorto may find refuge in the Directive's second scenario, which applies when "the alien's presence is necessary for continued administrative removal proceedings."  Directive ¶ 2.  Though this is a close question, we cannot conclude on this record that, were we to remand this case to the BIA, we would "know" that the agency

11

would not conclude that Lopez-Sorto's presence would be "necessary" for continued proceedings. As the regulations governing the BIA establish, the BIA upon remand could, in its discretion, "issue an order remanding [the] case to an immigration judge . . . for further consideration." 8 C.F.R. § 1003.1(d)(7)(ii). Unless the BIA "qualified or limited the scope or purpose of the remand," which it is not required to do, the IJ would not necessarily be limited in what she could consider upon remand. § 1003.1(d)(7)(iii). And the IJ could then decide that, based on the amount of intervening time or some other consideration, she would like to open the case up for additional factfinding and testimony from Lopez-Sorto. *See* Oral Arg. 21:40 – 22:10 (government conceding such a scenario is possible, if unlikely). True, "[a]n Immigration Judge may conduct hearings through video conference to the same extent as he or she may conduct hearings in person." § 1003.25. But the IJ could also determine she needs to assess Lopez-Sorto's credibility, which can turn on factors better evaluated in person, such as demeanor. So, even with the possibility of tele-testimony, a rational IJ might still decide that in-person testimony is necessary for further proceedings.[7]

---

[7] We recognize the ambiguity the word "necessary" presents. In some contexts, it has been construed to include only what is strictly essential or absolutely needed. *See Ayestas v. Davis*, 584 U.S. 28, 44 (2018); *Necessary, Merriam-Webster's Collegiate Dictionary* 828 (11th ed. 2020). But in other contexts, its meaning is broader, drawing in what is "convenient, useful, appropriate, suitable, proper, or conducive to the end sought." *Ayestas*, 584 U.S. at 44 (quoting *Necessary, Black's Law Dictionary* 928 (5th ed. 1979)). Because we find, however, that an IJ could plausibly determine that Lopez-Sorto's presence is either essential or merely helpful, we need not resolve which sense of "necessary" the Directive employs.

Accordingly, we agree with Lopez-Sorto and the government that the Directive preserves this case. Since it's possible that DHS will facilitate Lopez-Sorto's return to the country, it's possible that a favorable disposition of Lopez-Sorto's appeal will lead to his removal being deferred. So this case is not moot.

## III.    DISCUSSION

On the merits, Lopez-Sorto raises three issues. But none amounts to reversible error.

"When, as here, the BIA adopts and affirms the IJ's decision and supplements it with its own opinion, we review both decisions." *Ibarra Chevez v. Garland*, 31 F.4th 279, 288 (4th Cir. 2022) (quoting *Portillo Flores v. Garland*, 3 F.4th 615, 625 (4th Cir. 2021) (en banc)). We review legal questions—such as whether the agency applied the correct legal standard to determine the likelihood of torture—*de novo*; and we review factual findings—such as the likelihood of torture—for substantial evidence. *Id*. at 288–89, 291.

### A.    The IJ and BIA applied the correct legal standard.

Lopez-Sorto first argues that the IJ and BIA used the wrong legal standard in determining whether he was more likely than not to suffer torture should he be deported to El Salvador. To succeed on a CAT claim, an alien must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). In evaluating that claim, an immigration judge must consider "all evidence relevant to the possibility of future torture." § 1208.16(c)(3). Thus, when a CAT claimant asserts that he faces "multiple potential sources of torture," he is entitled to protection "so long as the aggregate risk of torture that he faces is above 50 percent," even

13

if the risk stemming from any individual source falls below that threshold. *Garcia v. Garland*, 73 F.4th 219, 233 (4th Cir. 2023).

### 1. *The IJ and BIA properly evaluated one of Lopez-Sorto's asserted risks of torture via a chain-of-events analysis.*

In the immigration proceedings, both the IJ and the BIA denied Lopez-Sorto's CAT claim in part by citing to *In re J-F-F-*, 23 I&N Dec. 912 (A.G. 2006), which states that a party cannot rely upon "a series of suppositions" to establish a risk of torture. *Id.* at 917. Instead, when a CAT claimant purports to rest his risk of torture upon the confluence of various independent conditions or a "hypothetical chain of events," the alien must show that "the entire chain will come together to result in the probability of torture." *Id.* at 917–18. Yet, as that opinion of the Attorney General recognizes, "[a]n alien will never be able to show that he faces a more likely than not chance of torture if one link in the chain cannot be shown to be more likely than not to occur." *Id.* at 918 n.4. In such cases, "[p]utting aside whether [an alien] is more likely than not to" experience the other identified conditions or events, the agency properly denies CAT protection where an alien fails to show that malefactors "would more likely than not torture someone in [that] position." *Id.* at 919–20. An alien's failure to show that any one necessary condition is more likely than not to occur, therefore—even assuming all the others do occur—dooms the claim.

That a chain of dependent events leading to a deportee's torture is no stronger than its weakest link is simple mathematical truth. For if some event necessarily antecedent to the alien's alleged torture only occurs, say, 45% the time, even assuming all other necessary events have a 100% chance of occurring, the risk of torture itself is capped at 45%. As *In*

14

*re J-F-F-* states, it "is the likelihood of all necessary events coming together that must more likely than not lead to torture, and a chain of events cannot be more likely than its least likely link." *Id.* at 918 n.4. Thus, rather than raising an alien's burden above the regulatory requirements, *In re J-F-F-* functions as a shortcut that the agency can use to disregard meritless CAT claims.

Still, Lopez-Sorto argues that we have implicitly abrogated this common-sense approach in *Rodriguez-Arias v. Whitaker*, 915 F.3d 968 (4th Cir. 2019), and *Garcia v. Garland*, 73 F.4th 219. In those cases, we explained that a CAT applicant need not prove a "specific chain of events leading to his torture." *Garcia*, 73 F.4th at 226 n.4. Because *In re J-F-F-* turns on a "chain of events" analysis, Lopez-Sorto's argument goes, the Attorney General's opinion irreconcilably conflicts with our precedents.

Lopez-Sorto's argument misses a key distinction between the cases he relies on and *In re J-F-F-*. *In re J-F-F-* is about what it takes to establish the likelihood that an alien would be tortured by a *single entity*. If the torture from that entity would only occur pursuant to a specific chain of events and "[t]he evidence does not establish that *any* step in this hypothetical chain of events is more likely than not to happen, let alone that the entire chain will come together," a court can know that torture from that particular source is not more likely than not to happen. *In re J-F-F-*, 23 I&N Dec. at 917–18 (emphasis added). *Rodriguez-Arias*, on the other hand, is about how to determine whether an alien has shown that it's more likely than not he will be tortured *when he has alleged several entities* as potential sources of torture. In such cases, a court must first determine the likelihood of torture by each entity, then combine each likelihood together to determine

15

whether, in the aggregate, the alien has shown he's more likely than not to be tortured. *Rodriguez-Arias*, 915 F.3d at 973. Neither that case nor any other case said that a chain-of-events analysis couldn't be used on that first step—*i.e.*, to determine the likelihood of torture from a single source—when the alien alleges that torture would only occur if a chain of events did. *See id.*; *Ibarra Chevez*, 31 F.4th at 289–90.

Here, the IJ only relied on a chain-of-events analysis where Lopez-Sorto's alleged source of torture did. The IJ individually discussed each of the three sources of torture that Lopez-Sorto identified: Salvadoran authorities, vigilante death squads, and street gangs. Without discussion of the "chain of events" analysis, the IJ noted that it was unlikely that Lopez-Sorto would be targeted or tortured by the first two. He only applied the "chain of events" analysis to Lopez-Sorto's assertion that he would be tortured by Salvadoran street gangs. The IJ noted that this risk could only materialize if (1) Lopez-Sorto encounters Salvadoran gang members, (2) those gang members learn that he has tattoos, such as by forcing him to remove his clothes in their presence, and (3) they decided to harm him because of his tattoos. This risk of torture, the IJ concluded, only arose by stringing together a "series of suppositions," and thus it was not likely to occur. A.R. 72. So the IJ properly looked to the likelihood of a chain of events as to a single alleged source of torture; he did not require proof of a specific chain of events whole-cloth.

### 2. *The IJ and BIA properly aggregated Lopez-Sorto's asserted risks of torture.*

Lopez-Sorto follows up his first argument with a claim that the IJ and BIA failed to aggregate his various risks of torture as they are required to do. *See Rodriguez-Arias*, 915

16

F.3d at 973 ("[T]he risks of torture from all sources should be combined when determining whether a CAT applicant is more likely than not to be tortured in a particular country.").

We have said, however, that we will not find a failure to aggregate "if the court can tell that the IJ and BIA 'combined the threats from each [source] in deciding that [the petitioner] did not demonstrate the requisite likelihood of torture.'" *Ibarra Chevez*, 31 F.4th at 290 (quoting *Marqus v. Barr*, 968 F.3d 583, 589 (6th Cir. 2020) (alterations in original)). And the IJ or BIA need not be crystal clear for us to do so. Thus, we have cited with approval cases that found no error where "[n]othing in the BIA's or the IJ's decisions suggest[ed] that they failed to consider the petitioner's probability of torture in the aggregate." *Id.* (quoting *Marqus*, 968 F.3d at 589 (alteration in original)); *see also id.* at 291 ("'[A] separate or lengthy aggregation analysis' is not required; 'it is enough that the record indicates the IJ and BIA considered the risk of torture in the aggregate[.]'" (quoting *Hassan v. Rosen*, 985 F.3d 587, 591 (8th Cir. 2021))).

The IJ's decision indicates he aggregated the risks of torture: He went through the three sources of possible torture identified by Lopez-Sorto and concluded, "given these factors," that it was not likely he would be tortured should he be deported to El Salvador. A.R. 73. By addressing each risk individually and then considering all three together in a final concluding paragraph where the IJ specifically noted that his conclusion resulted from the "factors" he had just reiterated, we "can tell that the IJ" aggregated the risks facing Lopez-Sorto. *Ibarra Chevez*, 31 F.4th at 290.

*Rodriguez-Arias* is not to the contrary. In that case, we found failure to aggregate after the IJ discussed three potential sources of harm in two separate orders. *Rodriguez-*

17

*Arias*, 915 F.3d at 973. The IJ discussed two of the potential sources in the first order and the third in a second order, but the two orders did not reference each other. *Id.* Instead, the language of the second order suggested that the IJ treated the third source in isolation from the first two. *Id.* Thus, even though the IJ might have aggregated the first two risks by discussing them both in her first order, *Ibarra Chevez*, 31 F.4th at 289, the failure to aggregate *all* the sources constituted reversible error. *Rodriguez-Arias*, 915 F.3d at 973. This case, however, resembles the *Rodriguez-Arias* IJ's first order because it discussed all the potential sources in the same order, which *Ibarra Chevez* recognized implied aggregation. *Ibarra Chevez*, 31 F.4th at 289

The BIA's order also recognized the IJ's aggregation analysis and made it explicit, noting that the CAT standard required aggregating the various risks of torture. And it applied that standard, holding that Lopez-Sorto "has not demonstrated that it is more likely than not that he will be tortured by the gangs, death squads, police or other public officials acting in an official capacity upon his return to El Salvador." A.R. 5. This clarified that the torture that was not more likely than not to occur wasn't just from *one* of the entities, but from the aggregate risk from those entities. And further down in its decision, the BIA again referenced its aggregation by holding that Lopez-Sorto failed to show that "it is more likely than not the respondent will be tortured if returned to El Salvador" after discussing the risk of torture posed by the gangs and government actors. *Id.*

Thus, unlike in *Rodriguez-Arias*, where neither the IJ nor the BIA aggregated the petitioner's risks, both the IJ *and* the BIA here applied the proper aggregation analysis.

18

While the IJ might not have been as clear as we would like, we conclude that the IJ's order sufficiently shows that he did consider Lopez-Sorto's risks in the aggregate.

### B. The IJ properly considered the expert witnesses.

Lopez-Sorto's final argument is that the IJ erred by ignoring the testimony of Lopez-Sorto's two expert witnesses without adequate justification. And true, "[t]he IJ and BIA abuse their discretion [when] they 'arbitrarily ignore relevant evidence.'" *Id.* (quoting *Rodriguez-Arias*, 915 F.3d at 974). But we have held that "[t]he BIA and IJ are not required to discuss every piece of evidence in the record." *Ibarra Chevez*, 31 F.4th at 292. Instead, all they must do is "announce their decisions in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted." *Id.*

The record does not show that the agency ignored Lopez-Sorto's experts. On the contrary, the experts' testimony was part of the foundation on which the IJ rejected Lopez-Sorto's claims. The IJ said that it took "into account the testimony of the two expert witnesses." A.R. 72. Part of that testimony was that Lopez-Sorto fell decades outside the key demographic targeted by gangs. While the IJ recognized that Lopez-Sorto had many risk factors, including his tattoos and past gang involvement, he decided that those were outweighed by Lopez-Sorto's risk mitigators, such as his lack of present gang affiliation and age. And though the experts concluded that Lopez-Sorto's age would not necessarily eliminate a risk of torture, the IJ decided to give greater weight to their testimony that Lopez-Sorto would not likely be a target for recruitment and their failure to identify a similarly situated person who has been tortured in El Salvador. Lopez-Sorto might be dissatisfied with the IJ's conclusion; but the "likelihood of torture . . . constitutes the

19

ultimate factual finding that rested solely with the IJ, and the IJ's decisions more than amply explain why [he] reached a contrary finding." *Ibarra Chevez*, 31 F.4th at 293.

Thus, to the extent that Lopez-Sorto argues that the IJ ignored his experts, he has not established a "wholesale failure" to consider that evidence. *See id.* at 292. And to the extent he argues that the IJ was unreasonable in concluding that Lopez-Sorto would not face a sufficient risk of torture in El Salvador, the experts themselves provided "substantial evidence" upon which the IJ could have reasonably reached that conclusion. *Id.* at 293.

*          *          *

For the foregoing reasons, the petition for review is

*DENIED.*